EARL H. WOODWORTH, Appellee, v. IOWA CENTRAL RAILWAY COMPANY et al., Appellants.

**RAILROADS:** Sales—Entire Assets of Grantor—Grantee Assuming
1  Liabilities—Privity of Contract—Fraud on Creditors: The absolute assumption by a grantee of the payment of all the existing liabilities of a grantor, and the agreement by such grantee to indemnify and hold grantor harmless from any such liabilities, in consideration of the transfer to grantee of all the assets of the grantor, creates something more than a mere "contract of indemnity" for grantor. By such assumption, the grantee puts

himself, practically, into the shoes of grantor. Such a contract creates a right of action in favor of such creditors against grantee. This is true even though an attempt is made to limit the promise to pay and indemnify by a clause ''that nothing in such contract shall be construed as giving any other person than grantee and grantor any right, remedy, or claim,'' as such latter clause, in so far as contradictory of the former clause, will be rejected as a fraud on grantor's creditors. So held where one railway company bought all the assets of another railway company.

PRINCIPLE APPLIED: Plaintiff, having been negligently injured, had a cause of action against a railway company of which he was an employee. Later, the company sold its entire railway, including all assets, to another railway company. The grantee assumed the payment of all liabilities of the grantor arising out of the operation of the railway and agreed to ''indemnify'' and save harmless the grantor against any and all such liabilities. This agreement was the very essence of the consideration. A later clause provided that nothing in the contract of sale, expressed or implied, was intended or should be construed to give to *any* person, other than to the grantor and grantee, any right, remedy, or claim. *Held,* (a) the latter clause, in so far as in' conflict with the first clause and as nullifying it, must be rejected as fraudulent, (b) the first clause was not a *mere* indemnity clause, .but a clear assumption of liability, and (c) a privity of contract arose, under the first clause, between plaintiff and the purchasing company, and plaintiff could maintain his action against both companies.

**ACTIONS:** Joinder of Causes and Parties—Ex Delicto—Ex Contractu—When Permissible. A creditor, in an action sounding in tort against his debtor, may join one who, by contract, has assumed and agreed to pay the debts of the said debtor. (Sec. 3545, Code 1897.)

PRINCIPLE APPLIED: (See No. 1.)

**ACTIONS:** Improper Joinder of Parties or Causes—Waiver. Objection to the improper joinder of (a) parties or (b) causes of action must be raised *before* answer or the objection will be waived. (Secs. 3547, 3548, Code.)

**EVIDENCE:** Negligence— Notice of Defects—Other Similar Defects. Evidence of defects, similar to but at other places than the particular defect relied on as constituting negligence, existing at different points throughout a large part of defendant's railway switching yards, but in the near vicinity of the place of accident,

is admissible to show notice to defendant of the existence of the particular defect relied on as constituting negligence, especially where the cause was tried on the theory that evidence of ''notice'' was necessary.

**EVIDENCE: Negligence—Notice of Defect—How Proven:** Notice to defendant of a defect on which negligence is predicated may be shown by plaintiff, both in the form of (1) actual knowledge to defendant of such defect and (2) constructively—that is, from the nature of the defect—defendant not having the legal right to dictate the *quantum* of proof which plaintiff shall offer in support of a fact in issue.

PRINCIPLE APPLIED: Plaintiff, an employee of a railway company, was injured by reason of a ''sag'' or low place in the railway track, causing the engine to lurch and throw plaintiff off the engine. The defect proven was such as to charge the defendant company with a duty to discover and to know of it. *Held,* defendant could not properly complain because plaintiff did not choose to rest on ''constructive'' notice of the defect, but proceeded farther in his evidence and introduced evidence tending to show ''actual'' notice.

**EVIDENCE: Expert Evidence on Nonexpert Question—Expert Drawing Only Inference Jury Could Draw—Effect.** Expert inferences from certain assumed facts, being the only inferences which the jury could draw from such facts, if believed by the jury to be true, are, while erroneously received, nonprejudicial.

PRINCIPLE APPLIED: Plaintiff claimed there was a ''sag'' in the track and that, as the engine passed over the sag it ''lurched'' and threw him off and injured him. He so testified. Later, as an expert, he was permitted to testify that an engine of that type and going at that speed would not, going over the track, ''lurch'' without striking a ''sag'' and that he would not have fallen from the engine had it not ''lurched.'' *Held,* while there was nothing in the case calling for expert testimony, yet under above rule the error was nonprejudicial. (The court says: ''There was nothing in such opinion as given by the plaintiff that was fairly calculated to corroborate him or to aid his credibility.'')

**MASTER AND SERVANT: Negligence—Personal Injury—Contradictory Statements—Evidence—Sufficiency.** Evidence reviewed and held sufficient to support verdict for personal injuries, notwithstanding statements by plaintiff alleged to be wholly inconsistent with his testimony on the trial.

**PLEADING:** Ambiguity—How Construed. An ambiguous pleading will be construed against the pleader.

PRINCIPLE APPLIED: Plaintiff, in a personal injury action, pleaded negligence in that defendant allowed a "sag" to exist in its track, which caused the engine to lurch and throw him off. Defendant pleaded that plaintiff had knowledge of the condition of the yards and track and assumed the risk incident to his employment "in the said yards," and the "dangers and hazards incident to riding over the tracks in their then condition," and that if defendant was negligent, the plaintiff was aware of the danger arising from such negligence and assumed the risk of the same. Defendant claimed this constituted a pleading of the assumption of risk *"incident to the employment."* *Held,* the pleading, being ambiguous, should be construed as pleading the assumption of risk "incident to the negligence of defendant."

**MASTER AND SERVANT:** Assumption of Risk (a) Incident to Employment and (b) Incident to Negligence—Distinction. "Assumption of risk incident to employment" and "assumption of risk incident to defendant's negligence" are two vastly different matters; the former is not an "assumption of risk" in its *true* sense. The latter is. For a master to say "The servant assumed the risk incident to his employment" is simply another way of saying, "I deny that I was negligent."

**MASTER AND SERVANT:** "Assumption of Risk Act"—Negligence —Risk "Incident to Employment"—Necessity for Instructions. The "assumption of risk" abolished (except under the imminent danger clause) by Chap. 219, Acts 33d G. A. (Sec. 4999-a3, Sup. Code, 1913), is that risk which is incident to the *negligence of the master.* The latter clause, viz., "this statute shall not be construed so as to include such risks as are incident *to the employment,"* is precautionary only. In such sense, it is not superfluous, but if said clause was omitted, the above construction would be inevitable. No instruction need be given on the effect of this last clause in the absence of a request therefor.

**DAMAGES:** Personal Injury—Instructions Permitting Speculation— Future Pain. Whether an instruction permitting a recovery for such "pain and suffering as plaintiff *may* endure in the future" escapes the vice of opening the door to mere speculation by the limitations (a) "as shown by the evidence," (b) "if any he will suffer in the future," and (c) "all as established by the evidence," *quaere.*

**DAMAGES:**  Personal Injury—Instruction Permitting Speculation—
Future Suffering—Hopelessly Permanent Injuries.  An instruction, if faulty because opening the door to mere speculation, in that it allowed a recovery for such future suffering as ''may'' be sustained in the future, is rendered unobjectionable in instant case by the fact that plaintiff's injuries were hopelessly permanent.

**TRIAL:**  Instructions—Correct Though Inexplicit—Special Instruction—Necessity for Request—Waiver.  If an instruction is correct as given, though not as explicit as desired, request *must* be made for the more explicit instruction, or waiver will be the penalty.

PRINCIPLE APPLIED:  In instant case, the instructions on the measure of damages in a personal injury action were correct as far as they went, but failed to limit the amount of recovery *to the present worth*.  No request was made for a more explicit instruction.  *Held*, error could not be predicated on the lack of specification.

**DAMAGES:**  Excessive Verdict—Permanent Injuries.  A verdict of $22,000 sustained.  Plaintiff lost both legs.  At the time of the accident he was 26 years old.  He had exclusively fitted himself for railroading, and was receiving $111 per month when hurt.

*Appeal from Hardin District Court.*—HON. C. E. ALBROOK, Judge.

WEDNESDAY, NOVEMBER 25, 1914.

REHEARING DENIED TUESDAY, JUNE 22, 1915.

ACTION for damages for personal injuries to plaintiff resulting in the loss of both legs.  At the time of the accident, the plaintiff was an employee of the defendant, engaged in the performance of his duties as switchman.  There was a verdict and judgment for plaintiff.  Defendant appeals.—*Affirmed.*

*C. H. E. Boardman, F. M. Miner* and *W. H. Bremner,* for appellants.

*Kelleher & O'Connor, Williams & Huff, Halloran & Starkey,* for appellee.

EVANS, J.—The accident in question occurred on April 11, 1910, in the railroad yards of the defendant at Oskaloosa. The defendant's switching crew consisted of two helpers and a foreman, besides the engineer and fireman. The plaintiff was one of the helpers, and was engaged in the line of his duty at the time of the accident. He was riding on the front footboard of the switching engine and was thrown off, as alleged, by the lurching of the engine, and was thrown in such a way that the wheels of the engine passed over his legs. The charge of negligence against the operating railway company is based upon the specifications that the track at the place of the injury was dangerous by reason of "low joints" in the rails, and that the speed of the engine was excessive in view of such condition of the track. The defendants denied all negligence and pleaded contributory negligence and assumption of risk.

There are two defendants, the Iowa Central Railway Company and the Minneapolis & Saint Louis Railroad Company. The first named was the operating railway company at the time of the accident, whose employee the plaintiff was. Before the suit was brought, the other defendant became the purchaser from the Iowa Central Railway Company of its railway and all its assets. As a part of the consideration therefor, it assumed all liabilities of the selling company. It is on this ground that the plaintiff claims to recover from both defendants on his alleged cause of action against the selling company.

The immediate circumstances of the accident were detailed by the plaintiff as a witness, as follows:

"I then got on the front end of the engine standing on the footboard, on the left-hand side—the east side. Mr. Andrews was on the right-hand side, and Mr. Frey was on the right-hand side, next to the drawbar. We were all on the footboard, on the head end of the engine that morning. I was on the left-hand side and the other two men were on the

right-hand side. The footboard is about the width of the rails—a little wider—four or five feet. It does not extend out as far as the pilot beam, and it was about ten inches short, I think. That morning we came up to High Avenue, a distance of about three blocks, and stopped. The foreman told us to go in on the house track. We stopped at High Avenue to pick up the foreman. Mr. Andrews got on the engine at First Avenue. The engine started south, and had run about 225 to 300 feet when the accident happened. The grade is very nearly level. If there is any grade at all, it is down grade. The engine was running approximately 8 miles an hour. The engine is generally pretty quick to pick up. Mr. Quackenbush was the engineer and Landfear was the fireman. The engineer is on the right-hand side when the engine is headed south. The fireman is on the left-hand side. I was on the fireman's side. It was about 6:05 to 6:15 when the engine started. Mr. Andrews started to get off. It was my duty to follow the engine foreman, Mr. Andrews. When Andrews started to get off, I started to get off, too. I did not think the engine was quite as far down as it was with reference to soft spots or low joints. We hit a low place in the track. The engine seemed to lurch forward and down, and my starting to get off it jerked me loose from the grabiron or handhold. Immediately before, my left hand was on the grabiron. That is the ordinary position in getting off. Just before that time, one hand was on the pin lifter and the other was on the grabiron. That is not the ordinary position in riding on an engine. I was listening to a conversation between Mr. Andrews and Mr. Frey. Andrews stepped off on the right-hand side. I started to get off on the left-hand side. I was accustomed to getting on and off an engine moving at that rate of speed. There was not anything in the rate of speed at which the engine was moving that was likely to throw me, and that was an ordinary place to step on or off the engine, moving at that rate of speed. When I started to step off, the engine seemed to dip down on my side, on the

left-hand side. The point where the engine seemed to dip down was at this soft spot—the soft spot where I got injured. That was between 225 and 300 feet south of the First Avenue crossing. That is the same soft spot as I described as being in the vicinity of where water had stood. The rail was ordinarily depressed at that point about 2½ to 3½ inches. The engine seemed to go down. It threw me loose. I was thrown forward, out of the rail. My body was on the outside of the rail. My legs were across the rail. I was in a position at right angles to the rail, my feet a little bit towards the engine. The pony trucks are about 16 or 18 inches from the front of the footboard. When I found myself falling, I tried to throw myself out of the way. The next thing was, it sort of all became blank; when I seen the engine was going to get me, I don't remember anything until the boys picked me up."

Other facts and the evidence relating thereto will be set forth later in the discussion of the alleged errors complained of by appellant.

1. RAILROADS: sales: entire assets of grantor: grantee assuming liabilities: privity of contract: fraud on creditors.

1. The first contention of the appellants is that the Minneapolis Company is in no manner subject to the plaintiff's suit, because of an express provision in its contract of purchase. The third and eighth clauses of the deed or contract whereby the one company purchased from the other were as follows:

"Third. The grantee hereby assumes the payment of all the current and ordinary charges, costs, liabilities and expenses of the grantor arising out of the operation of the railroad and property of the grantor and remaining unpaid at the date of the execution and delivery of this indenture and agrees to indemnify and save harmless the grantor from and against any and all such charges, costs, liabilities and expenses.

"Eighth. Nothing in this indenture expressed or implied is intended or shall be construed to confer upon or give to any person or corporation other than the parties hereto their successors and assigns any right remedy or claim under or by reason of this indenture or under or by reason of any covenant condition or stipulation herein contained, all the covenants, conditions and stipulations contained in this indenture being for the sole and exclusive benefit of the parties hereto, their successors and assigns."

The third clause is that upon which the plaintiff relies in asserting his claim against the Minneapolis Company. The eighth clause, above quoted, is that upon which the Minneapolis Company bases its denial of liability to the plaintiff. It is quite clear that the third clause, in the absence of the eighth, is sufficient to render the purchasing company liable to plaintiff for whatever amount was justly due him from the selling company. The defendant does not contend otherwise. Its contention is that the eighth clause completely negatives such liability to the plaintiff and confines the liability of the Minneapolis Company to the Iowa Central Company alone. That the terms of the eighth clause will bear such construction must be conceded. If such construction be given to it, its practical effect is to contradict and nullify completely the third clause. The Iowa Central Company turned over to the Minneapolis Company all its assets of every kind. It has nothing left but its name and its legal entity.

Ignoring the eighth clause, the contract, on its face, was just and free from fraud as to creditors of the selling company. If such eighth clause is to be construed as depriving such creditors of all right to avail themselves of the other provisions of the contract, then it was manfestly fraudulent on its face as to such creditors. In view of the conflicting provisions of these two clauses, one must necessarily give way to the other. The assumption of the liabilities of the selling company by the purchasing company was of the very essence

of the consideration. The undertaking was presumably equivalent to the benefit received. To enforce clause eight as construed by the appellants would be to defeat and to defraud every creditor of the selling company by rendering him dependent upon the mere grace of his debtor.

The precise question here presented was involved in *Hipwell v. National Surety Company*, 130 Iowa 656. It was there held that a condition similar to clause eight herein could not be enforced, because the same was in conflict with the covenants of the contract. That case is quite decisive of the point here presented. The cited case quite answers, also, the argument of appellant herein that the contract before us was one of mere indemnity for the selling company, and not of payment to its creditors. The contract in the *Hipwell* case was one of indemnity by an indemnity insurance company. The only consideration received by the insuring company was a comparatively small premium. The Minneapolis Railroad Company, appellant herein, is not an indemnity insurance company. Its undertaking was not entered into for a premium. Doubtless it is not empowered to undertake indemnity for a premium. Its contract herein is one of indemnity only in the sense that when one party, for a consideration, assumes to pay the debt of another, he does agree to indemnify and hold harmless to that extent. Such a contract is not one of *mere* indemnity, whereby the indemnifying insurer contemplates in his own favor the contingency that no loss or liability may arise, and in consideration of such contingency, accepts from the insured a small premium as a consideration for carrying the risk of a larger loss.

The contract before us dealt with accrued and existing liabilities. The purchasing company agreed to assume the same, not upon a contingency of their future arising, and not for a premium percentage, but for a consideration received in advance, presumably equal to the obligation assumed. If the contract should be construed as one of mere indemnity, and nothing more, as contended by the Minneapolis Company,

then no cause of action could arise thereon, even in favor of the Iowa Central Company, until it had actually paid in full its liability to the plaintiff herein. Having surrendered to the Minneapolis Company all its assets, it could, therefore, never pay such liability, and thereby mature a cause of action for indemnity.

We are clear, therefore, that, so far as clause eight contradicts the covenants of clause three, it must be ignored. Ignoring such clause, the authorities are abundant that a privity of contract arose between the purchasing company and the creditors of the selling company, whereby the creditors became entitled to enforce their claims by action against the purchasing company. *Knott v. Ry. Co.*, 84 Iowa 462; *Malanaphy v. Mfg. Co.*, 125 Iowa 719; *Weiser v. Ross*, 150 Iowa 353; *Beeson v. Green*, 103 Iowa 406; *Calumet Paper Co. v. Stotts Inv. Co.*, 96 Iowa 147; *Hanlon v. Smith*, 175 Fed. 192; *Dancel v. Goodyear Shoe Machinery Co.*, 144 Fed. 679, 680; *Billmyer Lumber Co. v. Merchants' Coal Co.*, 66 S. E. 1073, 1077; Thompson on Corporations, Secs. 6082, 6083, 6089, 6096.

2. It is further urged that, even though the Minneapolis Company be liable, under the provisions of the contract in question, there was a misjoinder of causes of action, as well as of parties, because the liability of the first named defendant was based on tort, and that of the second named defendant, upon its contract of assumption. As an original proposition, the point is not without logical force.

2. ACTIONS: joinder of causes and parties: *ex delicto: ex contractu:* when permissible.

The question, however, was settled otherwise in *Knott v. Ry. Co.*, 84 Iowa 462. To the same effect, see *Hanlon v. Smith*, 175 Fed. 192. Neither did the defendant raise the question of misjoinder in the lower court, as required by Secs. 3547 and 3548. The alleged misjoinder, if any, was apparent

3. ACTIONS: improper joinder of parties or causes: waiver.

upon the face of the petition, and could have been raised in the manner pointed out by the statute. Under such statute, it must, therefore, be deemed waived.

3. As already indicated, the charge of negligence against the operating company was predicated upon a defect in the track which allowed the end of one rail to sag. This condition resulted, as claimed, from lack of ballast or other support. The plaintiff introduced evidence tending to show such defect at the place of the accident. He also introduced evidence of similar defects in other places in the near vicinity of the place of the accident. Such evidence covered a large part of the switching yard.

4. EVIDENCE: negligence: notice of defects: other similar defects.

In the first instance, this line of evidence was introduced without objection. Later, objection was interposed to further testimony of the kind, because not confined to the place of the injury. Such objection was overruled, and complaint is now based on such ruling. Such evidence was offered and received on the theory that it tended to prove notice to the company. In its final argument before us, the appellant takes the ground that there was no burden of proving notice upon the plaintiff, and that such evidence was, therefore, irrelevant and incompetent. In putting forth this proposition, the appellant has quite changed front. The case was tried in the court below on the theory, apparently acquiesced in by both parties, that it was incumbent upon the plaintiff to prove notice of the defect complained of. The trial court so instructed the jury.

In appellants' opening argument filed in this court, they specifically challenged the sufficiency of plaintiff's proof of such notice. We quote the following from such argument:

"What proof is there that there was a defective track at the place of the injury?" "What proof is there that defendant had any notice of that defect?"

If proof of notice was necessary, then the line of evidence objected to was properly received for that purpose. If it was not legally necessary, the defendants were not prejudiced by the undue burden laid upon the plaintiff. If the defend-

ants had chosen to take the position in the district court which they have finally taken here, that no proof of notice was necessary, they could readily have eliminated such evidence.

Aside from all this, it is plain that notice of a defect, either actual or constructive, is ordinarily one of the elements of negligence predicated upon such defect. Where the facts are such as to charge a defendant with a duty to discover and to know a defect, notice will be implied without other proof. In such case, it would be immaterial whether there was actual notice or not. The constructive notice would be sufficient. There is no rule, however, which would preclude the plaintiff from proving actual notice as well as constructive notice, even though, because of such constructive notice, proof of the actual notice were unnecessary. On the proposition that notice in some form is an element of negligence, such as is herein involved, see *Case v. C. R. I. & P. Ry. Co.*, 64 Iowa 762, 763; *Baldwin v. R. R. Co.*, 68 Iowa 37, 44; *Kuhns v. R. R. Co.*, 70 Iowa 561, 566; *Brownfield v. C. R. I. & P. Ry. Co.*, 107 Iowa 254.

5. EVIDENCE: negligence: notice of defect: how proven.

4. Appellants complain of certain expert testimony given by the plaintiff himself as a witness. After showing his seven years' experience as a switchman, his counsel put to him the following hypothetical questions, which were answered, over objections herein shown:

6. EVIDENCE: expert evidence on non-expert question: expert drawing only inference jury could draw: effect.

Q. "Basing your answer upon your knowledge, observation and experience, what would you say to the jury as to whether an engine of that type, that you were riding on that morning, would lurch without striking a depression in the track, going at the rate of speed that it was proceeding, substantially eight miles an hour?" (Objected to as immaterial, incompetent and irrelevant, asking for the conclusion and opinion of the witness, incompetent under the issues in this

case, not a proper subject for expert testimony. Objection overruled. Defendant excepts.) A. "No, sir, it would not. . . ." Q. "Mr. Woodworth, what do you say to the jury as to whether or not you would have been thrown down, or fallen down in front of the engine, at the time of the accident, if the engine had not lurched, as you have described here in your testimony?" (Objected to as incompetent, immaterial and irrelevant, calling for the conclusion and opinion of the witness and not for any fact, not a proper subject of expert testimony; no proper foundation laid for the introduction of the testimony, and seeking to invade the province of the jury, and places the witness in the place of the jury. Objection overruled. Defendant excepts.) A. "No, sir, I would not."

Technically, we think the objection to each question ought to have been sustained. The plaintiff had testified that there was a depression at the place of accident, and that the engine did lurch as the wheels passed over it. There was nothing left for expert opinion. As to the second question, the plaintiff had already testified, in substance, that the lurching of the engine threw him. His testimony as to the circumstances excluded every other cause. There was nothing left for expert opinion there. On the other hand, such questions and the answers thereto could not have worked any possible prejudice to the defendant. It may be justly urged for appellants that such testimony was argumentative, but in this regard it was within the latitude of the discretion of the trial court. The inference drawn thereby was ordinary and nonexpert, and doubtless ought to have been left to the jury; but it was the only inference which the jury could draw, if it accepted the previous testimony of the plaintiff as to the facts. There was nothing in such opinion as given by the plaintiff that was fairly calculated to corroborate him or to aid his credibility, and nothing therein that could prejudice the defendants in the mind of the jury. The matter thus introduced was, therefore, plainly inconsequential and nonprejudicial.

5. Appellants urge the insufficiency of the evidence as a whole to sustain the verdict. It is not denied that there is a conflict in the evidence. It is not denied that the evidence on behalf of plaintiff is sufficient to sustain the verdict, if it can be believed. But it is urged that the testimony of the plaintiff is contradicted by such overwhelming weight that it ought to be disregarded.

7. MASTER AND
SERVANT :
negligence :
personal in-
jury : con-
tradictory
statements :
evidence :
sufficiency.

The defendants introduced in evidence certain formal admissions made by the plaintiff and reduced to writing on three different dates. It is claimed that his present testimony is seriously contradicted by each and all of such written admissions. The first of these was a written statement by the attending physician, purporting to have been made upon information received from the plaintiff in response to inquiry. The particular feature of this statement, which is emphasized, was that plaintiff remembered nothing about the circumstances of the accident, and did not remember that he had gotten upon the footboard of the engine, and did not remember that he had come up to the engine, his last memory being that he was going toward the engine. Five days later, a second written statement was signed by the plaintiff, the particular feature of which was that, though he remembered going up to the engine and throwing his coat thereon, he did not remember that he got upon the footboard. A few weeks later, a third written statement was signed by him, the particular feature of which was that he remembered coming back to the engine and of getting on the footboard, on the east side, and that he remembered nothing more. This statement also contained the following sentence, upon which stress is laid: "I do not know what caused me to fall, unless it was my fainting away." The contention of appellants is that these statements are so contradictory and inconsistent with the plaintiff's testimony upon the trial that they should be deemed to nullify it entirely. Before considering this contention, a few things should be noted in a preliminary way. None of the

foregoing statements was written by the plaintiff, but the last two were signed by him. The first statement was the physician's memorandum of all the information he could get from the plaintiff on the evening of the day of the accident.

The accident occurred in the forenoon. The wheels took off the plaintiff's legs; it still remained for him to undergo a surgical operation under anaesthetics, later in the day, whereby a further amputation was made by the surgeon upon each stump. At the close of this day of ordeal, he was unable to remember anything about the circumstances of the accident, and unable to remember that he had even reached the engine. We find it quite impossible to doubt the candor of this statement, or to deem it incredible that plaintiff's memory could fail him at this time, and yet be restored to him later.

The second statement was signed five days later. The plaintiff testified that he remembered nothing about reading or signing such statement, and did not know of it until it was presented to him upon the witness stand. He admitted, however, the genuineness of his signature thereto. This statement reiterated his want of recollection of the circumstances of the accident. It advanced one step, however, from the first statement. This is the statement which declared that he remembered his going up to the engine and throwing his coat thereon, but did not remember his getting upon the footboard.

The third statement declared that he remembered his getting upon the footboard, but remembered nothing more. Between the time of the second statement and the third, plaintiff had undergone two surgical operations. There had been pus formation, and one limb, at least, had been honeycombed with drainage tubes. These tubes totaled a length of more than 100 inches. Needless to say, he had been a constant sufferer during the period covered by the statement. Accepting the declarations of all such statements as true at the time, they do no more than to indicate that the memory of the plaintiff as to the immediate circumstances of the accident was obliterated by some cause, either temporarily or perma-

nently. The testimony on both sides showed that he did come up to the engine and did get upon the footboard, and did ride thereon in a standing position, for a considerable distance. He testified on the trial that he then remembered such fact. The fact was concededly true. Was his testimony that he then remembered it necessarily inconsistent with his previous failure to remember the same under the conditions already named? It is by no means unusual for the shock of a severe accident to impair or obliterate the memory of the patient as to events immediately preceding the accident.

It was the contention of appellants, however, that the accident to the plaintiff was the result of a fainting spell. Evidence was introduced by the defendant along that line. It is the contention now that the sentence which we have above quoted from the third statement was an admission by plaintiff that his falling was caused by a fainting spell. We see no necessary inconsistency in such statement. It only purported to be a concession of a possibility. The defendant was entitled to its contention before the jury. Such question was submitted to the jury by a specific instruction, to which no objection is urged. The trial court expressly instructed that if the plaintiff fell as the result of a fainting spell, then a verdict must be returned for the defendant. We are clear that the case at this point presents only a conflict of evidence, and that the verdict has abundant support.

6. The defendants pleaded the defense of the assumption of risk. Such evidence was submitted to the jury by an instruction in purported accord with the provisions of Chapter 219, 33d G. A. The substance of such instruction was that such defense was not available to the defendant, unless the conditions at the place where the accident occurred were such that a reasonably prudent person of ordinary intelligence would not have continued in the prosecution of the work in which the plaintiff was at the time engaged. Appellants do not deny the propriety of this instruction, so far as the affirma-

8. PLEADING: ambiguity: how construed.

tive defense of assumption of risk in the strict legal sense is concerned. They contend, however, that they pleaded the other so-called assumption of risk, viz., the risk naturally incident to the employment, and that the effect of the court's instruction was to eliminate from the consideration of the jury both the assumption of risk incident to the negligence of the defendant, and the assumption of risk merely incident to the employment.

So far as the answer was concerned, it pleaded the defense of assumption of risk in one division only. It charged the plaintiff with knowledge of the condition of the yards and track, and averred that the plaintiff assumed the risk incident to his employment ''in the said yards'' and the ''dangers and hazards incident to riding over the tracks in their then condition.'' It also charged that, if the defendant was negligent, the plaintiff was aware of the danger arising because of such negligence and assumed the risk of the same.

If the pleader intended to plead that assumption of risk which is merely incident to the employment, regardless of negligence, only a direct and unequivocal statement to that effect was necessary. As it is, the pleading

9. MASTER AND
SERVANT: assumption of
risk (a) incident to employment and
(b) incident to negligence:
distinction.

is quite ambiguous, and must be construed against the pleader. The answer should be construed as pleading the assumption of risk only in its true sense. We have held repeatedly that there is no occasion for pleading the assumption of risk incident to the employment. Such pleading adds nothing to the general denial and serves no function whatever. *Martin v. Light Company,* 131 Iowa 724; *Duffey v. Consolidated Block Coal Co.,* 147 Iowa 225. Inasmuch as such pleading, when made, presents no affirmative defense, and inasmuch as such allegation is mere surplusage, there can be no occasion for submitting the same to the jury as affirmative matter. While its legal proposition is sound, it inheres in the general denial, and should be submitted to the jury as such. This is only saying that a defendant cannot be

rendered liable by the mere fact of an accident to his em-
ployee, and that his liability can only arise upon a showing of
negligence or wrong doing.

In this respect the instructions of the trial court were
specific and emphatic, and no ground of complaint is urged at
this point.    It is argued, however, that under the present
statute, the court was required to submit to
the jury the question whether the danger en-
countered by the plaintiff was one merely
incident to his employment, the risk of which
he therefore assumed.    The statute relied on
is Chapter 219, 33d G. A., already referred to.
Sec. 1 thereof is as follows:

10. MASTER AND
SERVANT: "as-
sumption of
risk act":
negligence:
risk "incident
to employ-
ment"—ne-
cessity for in-
structions.

"That in all cases where the property . . . of an
employer are defective or out of repair, and where it is the
duty of the employer from the character of the place,
. . . to furnish reasonably safe . . . place to work,
the employe shall not be deemed to have assumed the risk, by
continuing in the prosecution of the work, growing out of any
defect as aforesaid, of which the employe may have had knowl-
edge when the employer had knowledge of such defect.
. . .. Nor shall the employe under such conditions be
deemed to have waived the negligence, if any, unless the dan-
ger be imminent and to such extent that a reasonably prudent
person would not have continued in the prosecution of the
work; *but this statute shall not be construed so as to include
such risks as are incident to the employment.*"

The last clause of the foregoing is relied upon by appel-
lants as requiring the court to submit to the jury as an affir-
mative defense the assumption of risk incident to the employ-
ment.    Such clause does not purport to add anything to what
precedes it.    It is precautionary only, and declares a construc-
tion or meaning to that which precedes it.    The construction
thus declared is the natural construction of the preceding lan-

guage used in the section. If the last clause had been omitted, the construction which it calls for would have been readily, if not necessarily, adopted without its mandate. Such section has reference to the affirmative defense of assumption of risk in its true sense, and to nothing more. Such is the construction recognized by the concluding clause referred to. If the defendant had requested a precautionary instruction at this point that was consistent with the statute, it would have been entirely appropriate. No such request was made.

Appellant's counsel did submit to the trial court certain requested instructions on the subject of assumption of risk, but these ignored the statute entirely and were inconsistent therewith.

7. Appellants complain of the instruction of the trial court on the subject of the measure of damages, in that such instruction permitted the jury to allow for any "pain and suffering that he may endure in the future, as shown by the evidence in this case, if any he will suffer in the future, and for the depreciation, if any, in his earning capacity, all as established by the evidence admitted before you on this trial." It will be noted that the apparent vice in this instruction is in the use of the words "may endure in the future." The tendency of such words is to open the door to mere speculation, and we have so held in a number of cases. *Fry v. Ry. Co.,* 45 Iowa 417; *Ford v. City of Des Moines,* 106 Iowa 94, 96; *Sanders v. O'Callaghan,* 111 Iowa 574, 581; *Hall v. Ry. Co.,* 115 Iowa 19; *Williams v. Clarke County,* 143 Iowa 328, 330.

11. DAMAGES: personal injury: instructions permitting speculation: future pain.

It will be noted that some limitation is put upon the terms thus used by the clauses, "as shown by the evidence" and "if any he will suffer in the future," and "all as established by the evidence admitted." Whether these limitations are sufficient to differentiate the instruction from the cases above cited is a close question.

In *Bailey v. Centerville,* 108 Iowa 20, 28, it was held suffi-

cient to limit the future pain to a time "as long as it will probably continue."

In some of the cited cases the objectionable expression was coupled with the limitation "as shown by the evidence." This was held insufficient.

We are not disposed to go any further than our previous cases in the finding of error at this point, because of the technical character of the error. We incline to the view that we would be going somewhat farther than heretofore if we were to hold that the limitations above quoted were insufficient to save the instruction from condemnation.

There is, however, another feature of the case that, to our minds, is quite conclusive, and we prefer to rest our holding thereon. The pain and suffering for which compensation may be allowed is such as is incident to the injury. The future pain to be considered is such as is incident to the duration of the injury complained of. The duration of the injury includes the future inconvenience, the loss of time and earning capacity, the impairment of the enjoyment of life, and the physical pain and mental anguish arising out of such a situation. The future duration of a personal injury and of the suffering arising therefrom is often a question of mere opinion, based to a greater or a less extent upon speculation, and submitted to the jury upon conflicting evidence.

12. Damages: personal injury: instruction permitting speculation: future suffering: hopelessly permanent injuries.

In the case before us, the question of the permanency of the injury is not open to difference of opinion or speculation or conflicting evidence of any kind. So conclusive was the fact that no distinctive evidence was offered upon it by either party. The plaintiff's injury was the loss of both his legs. Being necessarily permanent, nothing could be added to it, even by speculation of the jury. The impairment and inconvenience and anguish are inseparable from such permanency. We think, therefore, that in a case of indisputable permanent

injury, such as the loss of bodily members, there is no room for prejudice in the form of the instruction here used.

8. It is next urged by appellants that the court failed to limit the amount of recovery to the *present worth*. The instruction at this point is similar to that involved in the case of *Breen v. Iowa Central Ry. Co.,* 159 Iowa 537. In discussing this question in the *Breen Case,* we said: "The further complaint is made of the instructions as to the measure of damage in that the recovery for future damage 'was not limited to present value.' The language of the instruction given by the trial court is quite general at this point and is as follows: 'Such a sum as in your judgment will be fair compensation for the injuries which said Kelleher sustained.' That the rule or measure of damage contended for by appellant at this point is the correct one may be conceded. *Dougherty v. Railway Co.,* 137 Iowa 257, 14 L. R. A. (N. S.) 590, 126 Am. St. 282; *Williams v. Clarke County,* 143 Iowa 328, 330. It is not claimed that the instruction of the trial court contradicts this rule. It only lacks in specification. This question was considered by us in *Greenway v. Taylor County,* 144 Iowa 332, where substantially the same language was used. In that case, we held that the instruction in itself was not erroneous, and that, in the absence of a request for more specific instruction, error could not be predicated upon its lack of specification. We think that case must be deemed controlling here, although we deem it a much better practice for the trial courts to be specific in their instructions at this point. So we said in the *Greenway Case* and in *Williams v. Clarke County, supra.*"

In the case before us, there was no request for a more specific instruction. What we said, therefore, in the *Breen Case* above quoted is quite conclusive here.

9. Lastly, it is urged that the verdict is excessive. The trial court refused to reduce it. The verdict is very large;

13. TRIAL: instructions: correct though inexplicit: special instruction: necessity for request: waiver.

it is for $22,000. On the other hand, the injuries of the plain-

14. DAMAGES: excessive verdict: permanent injuries.
tiff are hopelessly great. At the time of the accident, he was twenty-six years of age, and was earning $111 per month. Plaintiff had devoted himself exclusively to railroading and was not fitted for any other line of work. He was rendered totally unfit to pursue his occupation. At the time of the trial, two and one-half years had elapsed since the accident, and he had been a great sufferer. That his disability and suffering must continue is undisputed. The magnitude of the verdict, therefore, though very great, has substantial support in undisputed facts.

We see no legitimate ground for our interference with it. The judgment below must be—*Affirmed.*

LADD, C. J., WEAVER and PRESTON, JJ., concur.